IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 12, 2015 Session

**IN RE LANDON R.**

**Appeal from the Juvenile Court for Madison County**
**No. 4944578      Christy R. Little, Judge**

_____

**No. W2014-01658-COA-R3-JV – Filed September 22, 2015**
_____

This case involves the modification of a parenting plan. The trial court denied Appellant Father's petition to modify the permanent parenting plan and to be appointed primary residential parent. However, the trial court granted Appellee Mother's petition to modify the permanent parenting plan without explicitly acknowledging a material change in circumstance. Mother's petition did not seek to alter the designation of the primary residential parent, and instead sought to modify the parenting schedule. Father appeals. Discerning no error, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

KENNY ARMSTRONG, J. delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and BRANDON O. GIBSON, J. joined.

Betty Stafford Scott, Medina, Tennessee, for the appellant, William Robert Richardson.

Andrea Snipes Lester, Jackson, Tennessee, for the appellee, Allison Elizabeth Grooms.

**MEMORANDUM OPINION[1]**

---

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

## I.  Factual and Procedural History

Appellant William Robert Richardson ("Father") and Appellee Allison Elizabeth Grooms ("Mother") are the parents of one child, a son, born July 19, 2009.  Although the parties were never married, when their son was born, they lived together at Father's parents' home.  Mother and Father began living apart, and, on May 19, 2011, entered into an agreed permanent parenting plan, which was approved by the trial court.

By agreement of the parties, the original 2011 parenting plan awarded Mother 208 days of parenting time and awarded Father 157 days.  The plan also named Mother as the primary residential parent and included a basic parenting schedule, under which Father would exercise parenting time from Wednesday at noon until Thursday at noon during week 1.  During week 2, Father would exercise parenting time from Friday at noon until Monday at noon and again from Wednesday at noon until Friday at noon.  The parenting plan also stated, "to satisfy the statute, the Mother is designated as the primary residential parent but the parties are effectively sharing joint custody."

Some months after entry of the agreed parenting plan, the parties disagreed on where their son should spend his time when both parties were at work.  Father relied solely on his mother for child care.  Meanwhile, Mother believed that a daycare setting provided much needed socialization and would better prepare the child for kindergarten.  In his petition to modify, Father alleged that, in September 2012, Mother unilaterally enrolled the child in a church daycare center and did not include Father or the paternal grandmother on the list of people allowed to pick up the child from the center.  Father also alleged that Mother changed the child's daycare multiple times and demanded that the child remain in the facility throughout the day, even when family members were available to care for the child.

Mother filed her petition to modify the permanent parenting plan on October 24, 2012.  As grounds for a material change in circumstances, Mother averred that:  (1) Father refused to leave the child in daycare during his week-day parenting time; (2) Paternal grandmother caused Mother to remove the child from two daycare facilities; (3) Mother was approved for Families First daycare, which mandates attendance Monday through Friday; and (4) Paternal grandmother was inconsistent and unreliable as the child's care provider.

On November 29, 2012, Father filed his response and counter-petition to modify the permanent parenting plan asking to be appointed primary residential parent.  Father alleged several changes in circumstance, including Mother's: (1) demonstrated lack of proper judgment; (2) unstable lifestyle, including nine police calls to her residence for "disturbing the peace, loud noise, kidnapping, and theft." (3) exposing the child to at least five paramours; (4) residential instability, i.e., Father alleged that Mother had lived in six different

2

residences over a three year period of time and had at least five different roommates during this time; (5) employment instability, i.e., Father alleged that Mother had worked at five different places; (6) impeding and controlling Father's parenting time; and (7) exposing the child to a registered sex offender, who resided on Mother's father's property. On December 13, 2012, Mother filed an answer to Father's counter-petition, wherein she denied Father's allegations.

On June 17, 2014, the trial court held a hearing on the parties' cross-petitions. Following the hearing, the trial court entered a parenting plan retaining Mother as the primary residential parent and increasing Mother's parenting time from 208 days to 220 days. Father was awarded parenting time every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m. During weeks when Father did not exercise weekend parenting time, he was awarded overnight parenting time on Tuesday and Thursday nights. Each parent was awarded approximately two weeks of parenting time during the month of July; otherwise, holidays and vacations were divided equally. Under the new parenting plan imposed by the trial court, Father receives 145 days of parenting time.

## II.    Issues

Father appeals. He raises five issues for review as stated in his brief:

1.    Whether the trial court erred in finding a material change in circumstances had not occurred sufficient to warrant modification of the primary residential parent.
2.    Whether the trial court erred in refusing to name Father as the primary residential parent.
3.    Whether the trial court erred in modifying the permanent parenting plan without finding a material change in circumstances.
4.    Whether the trial court's ruling accurately reflects the evidence.
5.    Whether Father should receive attorney's fees on appeal.

## III.    Standard of Review

In this non-jury case, we review the trial court's findings of fact de novo upon the record, with a presumption of correctness, unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); ***Kendrick v. Shoemake,*** 90 S.W.3d 566, 570 (Tenn. 2002). We review the trial court's conclusions of law de novo, with no presumption of correctness. ***Armbrister v. Armbrister,*** 414 S.W.3d 685, 692 (Tenn. 2013).

In approaching questions of custody and visitation, the needs of the children are

paramount; the desires of the parents are secondary. *Shofner v. Shofner*, 181 S.W.3d 703, 715-16 (Tenn. Ct. App. 2004); *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). Custody or visitation should never be used to punish parents for their human frailties and past mis-steps or, conversely, as a reward for parents. *Shofner*, 181 S.W.3d at 716; *Sherman v. Sherman*, No. 01A01–9304–CH–00188, 1994 WL 649148, at *5 (Tenn. Ct. App. Nov.18, 1994) (No Tenn. R. App. P. 11 application filed) ("[W]e do not use custody or visitation decisions to punish or reward parents for their conduct."); *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007).

A trial court's determination of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interest are factual questions. *See In re T.C.D.,* 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings. *See* Tenn. R. App. P. 13(d); *Armbrister,* 414 S.W.3d at 692-93. Determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards,* 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge,* 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court ... appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge,* 42 S.W.3d at 88.

### IV.    Analysis

#### A.    Modifying the Primary Residential Parent Designation

Father argues that the trial court erred in refusing to find a material change in circumstances sufficient to warrant a change of the child's primary residential parent. In modification cases, Tennessee Code Annotated Section 36-6-101(a)(2) states, in pertinent part, as follows:

> (B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a

preponderance of the evidence a material change in circumstance. A material change in circumstance does not require a showing of substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

\*\*\*

(C) If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2).

In ***Armbrister***, our Supreme Court explained the distinction between a "change in circumstance" required to modify a parenting schedule versus a "change in circumstance" required to modify "custody" – a statutory term this Court has equated to the designation of a "primary residential parent." ***Massey–Holt v. Holt,*** 255 S.W.3d 603, 608 (Tenn. Ct. App. 2007). "Some of the factors listed in section 36-6-101(a)(2)(C) as constituting a material change in circumstances for modification of a residential parenting schedule are not listed in section 36-6-101(a)(2)(B) as a material change in circumstances for purposes of modifying a 'prior decree pertaining to custody.'" ***Armbrister***, 414 S.W.3d at 702-703. The statute is clear that a "change in circumstance" with regard to the parenting schedule is a distinct concept from a "change in circumstance" with regard to the identity of the primary residential parent. ***Pippin v. Pippin***, 277 S.W.3d 398, 406-07 (Tenn. Ct. App. 2008). Because Father's petition seeks a change in custody, section 36-6-101(a)(2)(B) governs the standard for determining whether a material change in circumstances has occurred. That being said, "there are no bright line rules for determining when a change of circumstances should be deemed material enough to warrant changing an existing custody arrangement." ***Keisling v. Keisling,*** 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005). Decisions regarding modification of a custody arrangement turn on the facts of each case. ***Scofield v. Scofield***, No. M2006-00350-COA-R3CV, 2007 WL 624351, at \*4 (Tenn. Ct. App. Feb. 28, 2007).

5

Father's petition made several allegations regarding Mother's lifestyle and her decision making abilities. Father contends that Mother's multiple relocations, since entry of the 2011 parenting plan, indicate decreased stability as a parent. Additionally, Father argues that Mother has had various roommates and paramours in and out of her home, thus creating an unsuitable environment for the parties' son. The trial court noted Mother's numerous residences but found that Mother "does not have the family support that Father has been afforded."

Father also argues that Mother's allegedly inappropriate sexual relationships, including relationships with other women, have had a negative influence on the child. Mother admitted during her testimony that her last two relationships have been with women. Mother had a girlfriend at the time of trial but testified that she did not stay overnight when the child was present. The trial court noted that both Father and the paternal grandmother do not like Mother's lifestyle choices. However, the trial court pointed out that Father's sister, who spends time with the child, has also been involved in a same-sex relationship.

"A parent's sexual orientation can be a factor that the trial court should consider in making a custody decision, but it does not control the outcome of the case absent evidence of its adverse effect on the child." *In re Parsons,* 914 S.W.2d 889, 894 (Tenn. Ct. App. 1995). During the hearing, Father produced no evidence that Mother's sexual orientation had an adverse effect on their child. At the time of trial, Father was unmarried and living with his fiancé. The trial court found that both parties should use discretion in their interactions with their significant others when the child is present. According to the trial court, none of his evidence provided sufficient reason to change Mother's designation as primary residential parent.

Additionally, Father accused Mother of using drugs. However, the evidence presented at trial did not substantiate this allegation. Both parties admitted to smoking marijuana *together*, prior to the birth of their son. Upon motion by Father, prior to the hearing of this matter, both parties submitted to and passed a drug test.

Father also alleged that there were eight incidents where police were called to Mother's home for loud music, disturbing the peace, theft, and aggravated kidnapping. Father argued that the frequent police visits indicate that Mother's home is unsuitable for the parties' son. Mother was very candid with the trial court in discussing her experiences with the police. Mother admitted that she was the victim of an attempted kidnapping by a man who worked and stayed on her father's property. She testified that she was unharmed and that her son was not present at the time of the attack. Mother admitted that the police came to her home when she called to report a stolen computer. Mother also admitted that, when she lived at her Father's house, there were often family and friends outside using the pool.

6

Mother's testimony implied that the police were called due to the noise from the pool area. However, no further questions were asked that may have elicited a more complete answer. When questioned by the trial court, Mother definitively testified that the child was never at home when the police arrived. Although Father referenced multiple police reports in his testimony, he did not testify that he had personal knowledge of any of these incidents. Furthermore, the police reports were not made part of the record. No police officers testified, and no other evidence was introduced either to substantiate Father's allegations or to contradict Mother's testimony. From its findings, it is apparent that the trial court gave little credence to Father's allegations that the frequent police visits made Mother's home unsuitable. In the absence of supporting evidence, we conclude that the trial court correctly disregarded Father's argument concerning frequent police visits to Mother's home.

A review of the record supports the trial court's finding that Father did not meet his burden of proof to establish a material change of circumstances sufficient to warrant a change in the child's primary residential parent. Father alleged that Mother was using drugs, yet Mother passed a drug test. Father alleged many police visits to Mother's home but presented no evidence to support his testimony that such visits made Mother's home unsuitable for their son. Father alleged that exposure to Mother's lifestyle, in regard to her sexuality, is not in the child's best interest, but the record is devoid of evidence demonstrating an adverse effect on the child. For all of these reasons, we affirm the trial court's finding that Father did not meet his burden of proof to establish a material change in circumstance. Given the facts here, we cannot conclude, as argued by Father, that the trial court abused its discretion in finding that there was not a material change in circumstances sufficient to warrant a change of the primary residential parent. In light of our finding that Father failed to meet his burden of proof, we pretermit discussion of best interest in regard to a change in the primary residential parent.

### B. Modification of the Parenting Schedule

We next address Mother's petition to modify the parenting schedule. Tennessee courts have long held that "fashioning permanent parenting plans is one of the most important responsibilities courts have." *Armbrister*, 414 S.W.3d at 696. *See also Massey–Holt*, 255 S.W.3d at 607; *Boyer,* 238 S.W.3d at 255. As previously discussed, section 36-6-101(a)(2)(C) sets the standard for modifying a parenting schedule. Specifically, the statute states, in relevant part:

> A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant

7

changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(C). Accordingly, there is a "very low threshold for establishing a material change of circumstances" when the question is one of modification of the parenting schedule. *Boyer*, 238 S.W. 3d at 257. "Indeed, merely showing that the existing arrangement has proven unworkable for the parties is sufficient to satisfy the material change of circumstance test." *Carter v. Carter*, No. M2013-00193-COA-R3CV, 2013 WL 5568360, at *2 (Tenn. Ct. App. Oct. 7, 2013) (internal citations omitted).

Father argues that the trial court erred in granting Mother's petition to modify the permanent parenting plan without explicitly finding a material change in circumstances. However, Father testified during the trial that the 2011 parenting plan was not workable for school.[2] Father also admitted that it is in his son's best interest "to have a more stable schedule." The 2011 parenting plan required the parties to exchange the child at noon during the week. This became problematic for both parties and the daycare center because Father's parenting time began while the children were napping at the center. Clearly, once the child reaches mandatory school age, the noon exchange time will become even more problematic. Further, considering that Father conceded, during his testimony, that a change in the parenting schedule is needed due to changed circumstances, we conclude that his argument on the issue of no explicit finding of material change is without merit. Our review of the record supports a finding that that the circumstances, since the entry of the parenting plan agreed to by the parties, established a material change in circumstances warranting a change in the parenting schedule.

Modification of a parenting plan schedule requires a two-prong analysis. After determining that a material change of circumstance has occurred sufficient to modify the parenting schedule, the trial court must then determine that the modification is in the child's best interest. *Armbrister*, 414 S.W. 3d at 706. Tennessee Code Annotated Section 36-6-106(a) outlines fifteen factors used to determine what schedule may be in the best interest of the child. Here, Father argues that the trial court failed to make a best interest analysis. While the trial court is obligated to consider all the relevant statutory factors in reaching its decision, it is not required to list, in its opinion or orders, each of those factors. *Coley v. Coley,* No. M2007–00655–COA–R3–CV, 2008 WL 5206297, at *6 (Tenn. Ct. App. Jan.9, 2008).

---

[2] This trial was in June 2014, and the parties' son was to begin kindergarten in August 2014.

The trial court did make specific findings with regard to several of the factors outlined in the statute. One of the factors is the "disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care." Tenn. Code Ann. § 36-6-106(a)(4). The trial court found that mother had "a residence and a job with family medical coverage," while Father had "a job with no insurance coverage." Furthermore, Father did not contribute toward the cost of his son's health insurance, even though he had previously told Mother he would help pay this expense.

Another factor for consideration is "the love, affection, and emotional ties existing between each parent and the child." Tenn. Code Ann. § 36-6-106(a)(6). Here, the trial court specifically found that the child is healthy and that he loves both of his parents. There is no countervailing evidence in regard to this factor.

Concerning the "character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child," Tenn. Code Ann. § 36-6-106(a)(12), the trial court's order specifically required that both the paternal grandmother and Father's fiancé (once they marry) shall be placed on the school list so that they are allowed to pick up the child from school. It is clear from this order that the trial court considered the character and behavior of these people in making its ruling that they be placed on the pick-up list. From the totality of the circumstances, the trial court's failure to include discussion of every statutory factor concerning the child's best interest is not reversible error. Rather, the trial court's discussion of only those factors it deemed relevant is sufficient to support the conclusion that modification of the parenting schedule is in the child's best interest. Accordingly, the trial court did not abuse its discretion in modifying the parenting schedule.

### C. Accurate reflection of the evidence.

Father argues that the trial court's findings of fact did not accurately reflect the evidence presented at trial. It is true that the trial court made several mistakes in its findings of fact, including listing Father as the plaintiff, referring to the parties' son as a daughter, and listing fifteen trial exhibits instead of twenty. The most egregious error was the trial court's reference to Father's arrest for assault and disorderly conduct. The record contains no evidence of Father's arrest. Rather, the record reveals that the paternal grandmother was questioned as to whether she was arrested for assault and disorderly conduct, not the Father. Although we caution the trial court to proofread its orders, the misstatements cited by Father including the reference to Father's arrest do not appear to have played a role in the trial court's ultimate decision. Father also does not cite any cases in support of his position that the trial court's order should be vacated due to the misstatements in the findings of fact, which we find to be harmless error.

9

Father also argues that the trial court did not make adequate findings of fact as required by Tennessee Rule of Civil Procedure 52.01 and urges this Court to conduct its own independent review of the record. In support of his position, Father cites the case of *Wall v. Wall*, No. W2010-01069-COA-R3CV, 2011 WL 2732269 (Tenn. Ct. App. July 14, 2011). We find that this case is easily distinguished from *Wall*. In the *Wall* case, the mother worked the early shift, which required her to leave the house before 5:30 a.m.; she often made poor decisions with regard to care providers for her six-year old daughter, including leaving her daughter in the care of her eleven year-old son, even after the court ordered the mother to stop. In this case, although Mother works long hours, she fought to keep the child in a stable daycare environment to better prepare him for kindergarten. In the *Wall* case, there was ample evidence that the mother was not meeting her daughter's needs. For example, the child's teachers were unable to communicate with mother despite repeated attempts to do so. The mother's after-school child care plan was to have her daughter "go door to door until she found someone to care for her." *Wall v. Wall*, 2011 WL 2732269, at *8. Perhaps of greater importance, in the *Wall* case, the child's psychologist testified that the child improved while in the care of her father. In the case at bar, as previously discussed, there was no corroborating evidence presented at trial to support Father's allegations that Mother's home was unsuitable for their child or that the child improved or blossomed while in his care.

### D.     Attorney's fees.

Father asks for an award of attorney's fees incurred on appeal. Specifically, he seeks these fees pursuant to Tennessee Code Annotated section 36-5-103(c), which provides:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tenn.Code Ann. § 36-5-103(c). This section also applies to awards of attorney's fees incurred on appeal. *See generally Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004) ("Tenn. Code Ann. § 36–5–103(c) vests in this court the discretionary authority to award these fees and costs in proper cases."). "In considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's

10

success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case." ***Moran v. Wilensky***, 339 S.W. 3d 651, 666 (Tenn. Ct. App. 2010)(citing ***Archer v. Archer***, 907 S.W. 2d 412, 419 (Tenn. Ct. App. 1995)). Because we have affirmed the trial court's holdings in this case, we exercise our discretion and deny Father's request for attorney's fees.

## V.     Conclusion

For the foregoing reasons, we affirm the order of the trial court. We remand the case for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, William Robert Richardson and his surety, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE